621 A.2d 476

HERBERT B. BRESSMAN, SHERRILL I. BRESSMAN, MILTON STEINHORN AND LOIS STEINHORN, PLAINTIFFS–RESPON-DENTS, v. RICHARD GASH, DEFENDANT–APPELLANT, AND EDISON TOWNSHIP PLANNING BOARD, DEFENDANT–RE-SPONDENT.

Argued December 1, 1992—Decided March 30, 1993.

*Thomas R. Farino, Jr.,* argued the cause for appellant.

*Sheldon Schiffman* argued the cause for respondent Edison Township Planning Board (*Schiffman & Aiello,* attorneys).

*Angelo H. Dalto* argued the cause for respondents Herbert B. Bressman, Sherrill I. Bressman, Milton Steinhorn, and Lois Steinhorn (*Dalto & Abrams,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case requires that we determine whether the changes in a second application for a bulk variance under *N.J.S.A.* 40:55D–70c suffice to avoid the bar of *res judicata* that arises from the judicial reversal of an earlier grant of the variance. The Edison Township Zoning Board of Adjustment (the Board of Adjustment) granted a rear-yard-setback variance to defendant Richard Gash. The Law Division affirmed the grant of the variance, but the Appellate Division reversed. Gash's second application contained changes that the Edison Township Planning Board (the Planning Board) found sufficient to preclude application of *res judicata*. The Law Division held that *res judicata* barred the Planning Board from considering the application on the merits. In an unreported decision, the Appellate Division affirmed a judgment of the Law Division that reversed the Planning Board's decision. We granted Gash's petition for certification, 130 *N.J.* 14, 611 *A.*2d 653 (1992), and now find that the Planning Board was not arbitrary, capricious, or unreasonable in determining that the second application differed sufficiently from the first to justify considering it on the merits. We reverse the judgment of the Appellate Division, and remand the matter to the Law Division for entry of an order granting the variance.

–I–

In 1987, Gash applied to the Board of Adjustment for a rear-yard variance to construct a 3,870–square–foot single-family home on a 25,325–square–foot vacant lot designated as Block 557–CC, Lot 9–D–9 (the lot) on the Edison Township Tax Map. The lot is located in an R–A zone at the end of a cul-de-sac on Sleepy Hollow Road. Wedge-shaped, the lot widens from sixty-seven feet at the street line to a 315–foot rear-lot line that ranges in depth from 125 to 140 feet. Although the lot conforms with all zoning requirements, it is smaller than many of the surrounding lots. The home, a 30– by 117–foot brick ranch

house, which has since been constructed, is compatible with the custom-built homes that establish the character of the neighborhood. Gash, who suffers from a heart condition, designed a single-story home.

For aesthetic reasons, the design included a garage with an entry on the side. The lot could accommodate a side-entry garage only by locating the house behind the thirty-five-foot-minimum front setback. Consistent with the front-yard setbacks on the existing homes, Gash located his home fifty-five feet back from the curb. Because of the shallowness of the lot, the rear of the house was only twenty-eight-feet from the rear-lot line, thereby necessitating a thirty-two-foot variance from the minimum rear-yard setback of sixty feet.

Three neighbors objected, only two of whom, plaintiffs Herbert B. and Sherill I. Bressman and Milton and Lois Steinhorn, continue to object. Former plaintiffs Alan and Marylou Greenblatt originally objected, but no longer do so. The rear corner of the Steinhorn property abuts one rear corner of the lot; the Bressman property, which is on the far side of the Steinhorn property, does not abut the lot.

Plaintiffs objected not to the erection of the proposed house, but to its location within the sixty-foot rear-yard setback. They presented two alternative designs for the location of a home on the lot. Their plans, both of which depicted garage doors on the front of the house, also required rear-yard-setback variances.

On June 30, 1987, the Board of Adjustment unanimously granted the requested rear-yard variance. In granting the variance, it stated:

6. The Board finds that due to the irregular shape of the property, it would be almost impossible to construct a house on the property comparable to surrounding houses without the necessity of some variance. In view of the distance between the houses to the rear of the property and the applicant's property line, the Board finds that it would be more advisable to have a rear yard variance than a side yard variance. Even considering the objectors' alternate plans, it is obvious that it would be impossible to construct the house

without the necessity of a rear yard variance, and under Alternate Plan B a side yard variance.

Of the three proposed plans, that of the applicant, as well as the alternate plans of the objectors, the Board finds that the applicant's plan is most acceptable and would have the least affect [sic] upon surrounding properties.

7. The Board further finds that the granting of the requested variances would have no adverse affect [sic] upon the surrounding properties and would not impair the intent and purpose of the zone plan and zoning ordinance in view of the distance between the rear of the proposed dwelling and the rear of the dwellings on the property located to the rear of the subject property.

Plaintiffs appealed to the Law Division, which affirmed the grant of the variance, whereupon they appealed to the Appellate Division. Gash began building while the appeal was pending, completed construction in March 1989, and has since occupied the dwelling.

Also in March 1989, the Appellate Division reversed the grant of the variance. The court correctly noted that the Board of Adjustment had not indicated whether it was granting the variance under *N.J.S.A.* 40:55D–70c(1) or (2).[1] A c(1) variance

---

[1] The board of adjustment shall have the power to: "(1) Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship; (2) where in an application or appeal relating to a specific piece of property the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, grant a variance to allow departure from regulations pursuant to article 8 of this act; provided, however, that no variance from those departures enumerated in subsection d. of this section shall be granted under this subsection; and provided further that the proposed development does not require approval by the planning board of a subdivision, site plan or conditional use, in conjunction with which the planning board has power to review a request for a variance pursuant to subsection a. of section 47 of this act...." (Footnote references omitted.)

requires proof of the "positive criteria," which are predicated on "exceptional and undue hardship" because of the exceptional shape and size of the lot. A c(2) variance requires a balancing of the benefits and detriments from the grant of the variance. *Kaufmann v. Planning Bd.*, 110 *N.J.* 551, 558–60, 542 *A.*2d 457 (1988). Both c(1) and (2) variances require proof of the negative criteria, which consists of the absence of substantial detriment to the public good and to the zone plan and zoning ordinance.

The Appellate Division concluded that the record did not demonstrate the hardship requisite for the grant of a c(1) variance. In so concluding, the court proceeded from the inaccurate factual premise that the house that Gash "wants to build could be constructed on the property without any deviation from the requirements of the ordinance if his contemplated two-car garage were built to open toward the front of the house...." The evidence before the Board of Adjustment indicated that Gash would have needed a variance even if he were to have located his home as shown on plaintiffs' alternate plans.

The court's rejection of a c(2) variance proceeded from its assumption that only Gash, and not the community, would benefit from the grant of the variance. Implicit in its rejection was the court's disagreement with the Planning Board's finding that the proposed house was aesthetically more pleasing than one that would conform to the zoning ordinance and that the house would benefit the community. Indeed, the court did not even note that "a desirable visual environment" is one of the acknowledged purposes of zoning. *N.J.S.A.* 40:55D–2.

The Appellate Division also concluded that because strict enforcement of the zoning ordinance would not deny Gash all use of his property, the Board of Adjustment had erred in finding the existence of "hardship." Entitlement to a dimensional variance, however, does not depend on proof that the hardship results " 'in the inability to make *any* use of the

property.' " *Kaufmann, supra,* 110 *N.J.* at 562, 542 *A.*2d 457 (quoting *Davis Enterprises v. Karpf,* 105 *N.J.* 476, 493, 523 *A.*2d 137 (1987) (Stein, J., concurring)). Proof that an ordinance zones property into inutility can establish hardship, but such proof is not the only justification for a hardship variance. On the facts of this case, the Board of Adjustment satisfied the requirement for a dimensional variance because of hardship. The Board satisfied that requirement by finding that "it would be almost impossible to construct a house on the property comparable to surrounding houses without the necessity of some variance."

Although Gash unsuccessfully requested the Appellate Division to reconsider its decision, he did not petition this Court for certification. Instead, he filed a second application with the Board of Adjustment. Because Gash sought minor subdivision approval as well as the rear-yard variance, the Board of Adjustment transferred the matter to the Planning Board.

The purpose of the subdivisions was to permit Gash to adjust his lot lines. One subdivision involved an exchange of small triangles of property with Gash's neighbor to the rear, Frank Havlenka. The effect of this exchange was to increase the minimum distance from the rear-lot line to thirty-two feet. The other subdivision involved a transfer of a wedge of property from Thomas Swales, who owned property on one side of the Gash property. Unbeknownst to Gash or the Board of Adjustment, Gash's home, as built, exceeded the principal building lot coverage by .28% and the total impervious coverage by two percent. The Swales subdivision eliminated the need for variances to remedy those violations. Gash also proposed a landscape buffer to screen the lot from plaintiffs' property. In sum, the only variance that Gash required was for the thirty-two-foot rear-yard setback.

At the hearing, counsel for both Gash and plaintiffs called licensed land-use planners to testify. Gash's planner, Paul Szymanski, found the changes in the second application to be

"significant." Concerning a c(1) variance, he found "hardship" to exist because the shape and size of the lot, particularly when considering the sixty-foot-setback requirement, led to "an extremely limited building envelope," the area in which a proposed building can be placed without violating setback requirements. The building envelope of the lot was only fourteen percent, as compared to a forty-four percent envelope for some adjoining properties. In addition, the lot contained only sixty percent of the depth of adjoining lots.

The planner also found that Gash was entitled to a c(2) variance because his dwelling comported with the character of the area and was designed to promote a desirable visual environment. According to Szymanski, the benefit from the grant of the variance would be "a house on the lot in keeping with the character and vogue of the neighbors and neighboring properties [that would] maintain and promote the aesthetics of the Sleepy Hollow neighborhood." He specifically noted that the side-entry garage was critical because the house was located at the end of a cul de sac. Szymanski testified that granting the variance would not substantially impair the purpose and intent of the zoning ordinance or the public good.

Plaintiffs' expert, James W. Higgins, testified that a conforming single-story home could be built within "the building envelope for the lot." He thought the proposed subdivisions made "no sense." Reducing Gash's rear-yard setback, according to Higgins, benefitted Gash but not the neighborhood. Although Higgins recognized that the proposed screening and buffering would reduce the visibility of Gash's house, he said it would also reduce the openness of the neighborhood.

Several neighbors testified in favor of the application. They thought that Gash's house was "an asset to the area" and "a significant benefit to the neighborhood." Only Higgins spoke against it.

After receiving the advice of its counsel, the Planning Board unanimously concluded that the application incorporated sub-

stantial changes. In reaching that conclusion, the Planning Board relied on the two subdivisions and the landscaping and buffering. The Planning Board found on the issue of *res judicata:*

> The applicant has demonstrated that the subject application for minor subdivision and bulk variance relief represents a substantial change over the proposal before the Zoning Board of Adjustment in the following respects:
>
> A. The rear yard variance due to the lot line adjustment is now 28 feet as opposed to 32 feet;
>
> B. The addition of 2158 square feet from Lot 9–D–10 has eliminated the maximum building coverage and total impervious coverage variances;
>
> C. The addition of the area of dense screening to the rear of the lot will represent the functional equivalent of the rear yard setback and buffer requirement.

After considering the application on the merits, the Planning Board granted the variance.

The Law Division reversed. Ignoring the landscaping and buffering, the court noted that the only change was in the lot lines. It concluded that the Planning Board had been arbitrary, capricious, and unreasonable in finding that the change in the application was sufficient to avoid *res judicata.* The Appellate Division affirmed substantially for the reasons given by the trial court.

–II–

■ As posed by plaintiffs in their attempt to bar the Planning Board from hearing Gash's application, the question is not whether that Board must hear the matter if it does not want to, but whether a reviewing court may preclude such a hearing if that board wants to proceed. The answer depends on the application of *res judicata* to the decisions of local land-use agencies.

■ As a general rule, an adjudicative decision of an administrative agency "should be accorded the same finality that is accorded the judgment of a court." *Restatement (Second) of Judgments* § 83 comment b (1982) (*Restatement*); *see* Kenneth C. Davis, 4 *Administrative Law Treatise* § 21.9 (2d ed. 1983).

Underlying the doctrine of *res judicata* is concern for the stability of results. *Restatement, supra.* The application of *res judicata* to adjudicative decisions of administrative agencies, like its application to judicial decisions, rests on policy considerations such as "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness...." *Hackensack v. Winner,* 82 *N.J.* 1, 32–33, 410 *A.*2d 1146 (1980).

As the parties recognize, our opinion in *Russell v. Board of Adjustment of Tenafly,* 31 *N.J.* 58, 155 *A.*2d 83 (1959), controls this case. *Russell* held that courts should not preclude a board of adjustment from considering a second application for a variance if the application contains changes that are "sufficient." *Id.* at 66, 155 *A.*2d 83. The second application in *Russell* involved an increase in the front setback from twenty-five to thirty feet and a decrease in the building coverage from eighteen percent to twelve percent. We held that the board had not abused its discretion in considering the second application. *Id.* at 67, 155 *A.*2d 83. That holding underscores the power of a local land-use agency to determine initially the sufficiency of a change, a determination that should "be overturned on review only if it is shown to be unreasonable, arbitrary or capricious." *Ibid.* Thus, the question is not whether a reviewing court would have reached a different conclusion if it had initially decided the matter, *Kaufmann, supra,* 110 *N.J.* at 558, 542 *A.*2d 457, but whether the Planning Board was arbitrary, capricious, or unreasonable in concluding that Gash's second application was sufficiently different to justify considering it on the merits.

We find that the Planning Board did not abuse its discretion in deciding to consider Gash's application. That board, based on the testimony of the applicant, neighbors, and experts, reasonably could have found that the addition of the landscape

screen and the minor subdivisions justified its consideration of the application.

In the application to the Board of Adjustment, Gash did not propose any subdivisions or any rear-yard screening. The Planning Board could have found that the changes mitigated the adverse impact of the variance. In sum, the Planning Board was not arbitrary, capricious, or unreasonable in concluding that the differences justified its consideration of Gash's application on the merits.

–III–

After concluding that it could consider Gash's application, the Planning Board proceeded to grant the requested variance:

> 3. The Planning Board further finds that by reason of the exceptional shape of the subject property, being pie-shaped in nature with 67 feet of frontage fanning out to 315 feet for the rear yard lot line, the subject lot is exceptionally shallow providing for an extremely limited building envelope of only 14% as compared to 44% for surrounding lots and accordingly concludes that the strict application of the rear yard setback requirement would result in peculiar and exceptional practical difficulties and undue hardship upon the owner.

> 4. The Board finds that the benefits to be derived from the grant of the bulk variance for rear yard setback substantially outweigh any detriment and that said benefits are not purely private in nature. The Board finds that the single family dwelling constructed by the applicant is in keeping with the character of the area and promotes a desirable visual environment and further that aesthetics associated with the property in question is a proper basis for the grant of bulk variance relief pursuant to *Ciocon vs: Franklin Lakes*, 223 NJ Super 199 [538 *A.*2d 427].

> 5. The Board further finds that the applicant has met its burden with regard to a showing of the absence of the so-called "negative criteria". The applicant has demonstrated that the sought-after variance relief may be granted without substantial detriment to the public good and without substantial impairment to the intent and purpose of the zone plan and zoning ordinance. The applicant has demonstrated that its proposed area of dense screening will constitute the functional equivalent of the rear yard setback requirement of the ordinance

Because the lower courts held that the Planning Board was barred by *res judicata,* they did not consider the propriety of the variance. Ordinarily, the Law Division initially reviews the determinations of municipal land-use agencies. *R.* 4:69. In

the exercise of our original jurisdiction, however, we can conclude the matter. *R.* 2:10–5; *Pieretti v. Bloomfield,* 35 *N.J.* 382, 385, 173 *A.*2d 296 (1961). No useful purpose would be served by remanding the matter to the lower courts for their review of the record, which would be subject to review by this Court. At our direction, the parties submitted supplemental briefs on the propriety of the grant of the variance. Bound by the same scope of review as the Law Division, our role is to defer to the local land-use agency's broad discretion and to reverse only if we find its decision to be arbitrary, capricious, or unreasonable. *See Charlie Brown v. Board of Adjustment,* 202 *N.J.Super.* 312, 321, 495 *A.*2d 119 (App.Div.1985) (upholding board of adjustment's denial of mixed-use variance).

So constrained, we find that the record supports the grant of both c(1) and (2) variances. Gash's expert, Szymanski, testified that because of the unusual shallowness and shape of the lot, building a house commensurate with surrounding houses was impractical without a variance. In contrast to most of the neighboring properties, which have depths exceeding 200 feet, the maximum depth of Gash's lot is 140 feet and only 125 feet at the center. Although the ordinance requires a front-yard minimum setback of thirty-five feet, the average setback of the surrounding houses is fifty to sixty feet. Furthermore, the ordinance requires that the setback be the average of the adjacent setbacks if the average is greater than the minimum. Thus, the zoning ordinance, as well as good planning, support a fifty-five-foot front-yard setback. With a lot depth of only 125 feet in the center, a front-yard setback of fifty-five feet places the dwelling almost on the sixty-foot rear-yard-setback line. Finally, the "building envelope" for the lot was less than a third of the envelope for adjoining properties. We cannot say that the Planning Board was arbitrary, capricious, or unreasonable in concluding that the physical characteristics of the lot both precluded construction of a house consistent with the character of the neighbor-

hood and constituted a sufficient hardship to support the grant of a c(1) variance.

We likewise find record support for the Planning Board's conclusion that Gash has satisfied the negative criteria. Szymanski testified that the proposed landscape buffer between the Steinhorn's back corner and Gash's lot met the purpose of the large rear-yard setback by enhancing privacy. The Board could have concluded legitimately that Gash's home did not substantially impair the public good or the purposes of the zoning ordinance, and that it enhanced the character of the neighborhood.

Considering the grant of the variance under c(2), the record supports the Planning Board's finding that Gash's home was "in keeping with the character of the area and promotes a desirable visual environment...." When contemplating a c(2) variance, a local land-use board may consider the recognized purposes of zoning. *Kaufmann, supra,* 110 *N.J.* at 563, 542 *A.*2d 457. One such purpose is "a desirable visual environment." *N.J.S.A.* 40:55D–2. In this case, the Planning Board properly considered the aesthetic effect of Gash's proposal in deciding whether the grant of the variance would advance that purpose. Although the record does not necessarily compel the grant of either a c(1) or (2) variance, we find that the Board acted within its discretion in granting the application.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for the entry of an order approving the Planning Board's grant of the variance.

*For Reversal and Remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI, POLLOCK and STEIN—7.

*Concurring in result*—Justice STEIN—1.

STEIN, J., concurring.

I join in the judgment of the Court and in Justice Pollock's thoughtful and comprehensive opinion. I write separately in an effort to overcome the lingering misconception that proof of hardship necessary to support a dimensional variance under *N.J.S.A.* 40:55D–70c(1) requires evidence that without the variance the property would be zoned into inutility. That variant of hardship typically has been advanced to support use variances. See *Medici v. BPR Co.*, 107 *N.J.* 1, 17 n. 9, 526 *A.*2d 109 (1987). Prior to the 1948 amendments to the land-use statutes, *L.* 1948, *c.* 305, no use variance could be granted without a finding of undue hardship, consisting of proof that the property is not reasonably adapted to a conforming use. See *Monmouth Lumber Co. v. Ocean Township*, 9 *N.J.* 64, 76–77, 87 *A.*2d 9 (1952); *Brandon v. Board of Commissioners*, 124 *N.J.L.* 135, 149, 11 *A.*2d 304 (Sup.Ct.), *aff'd*, 125 *N.J.L.* 367, 15 *A.*2d 598 (E. & A. 1940). Confusion about the type of hardship necessary to sustain a dimensional variance readily can be traced to the period in which use variances were cognizable under both subsections c and d of the variance provision in the land-use law. See *Commercial Realty & Resources Corp. v. First Atlantic Properties Co.*, 122 *N.J.* 546, 554–57, 585 *A.*2d 928 (1991) ("Thus, the anomalous state of affairs after the 1948 amendment to *N.J.S.A.* 40:55–39 was that boards of adjustment could grant use variances under subsection c based on proof of undue hardship, and could recommend the grant of use variances to the governing body under subsection d based on proof of special reasons, a standard that could but need not be satisfied by proof of hardship." *Id.* at 555, 585 *A.*2d 928.). The overlapping jurisdiction of subsections c and d over use variances was resolved in 1953 by an amendment prohibiting the grant of use variances under subsection c. *L.* 1953, *c.* 288. Nevertheless, as evidenced by the initial Appellate Division decision in this matter, courts and practitioners continue to assume that the proof of hardship necessary to sustain a dimensional vari-

ance is identical to the evidence of hardship that may be advanced to support a use variance.

As reflected by the record in this case, that higher standard of proof would be inapplicable in dimensional-variance applications because in such cases the use ordinarily conforms to the ordinance. Hence, Gash would have been unable to establish that his property could not be put to a conforming use without the grant of a variance. The appropriate context in which hardship is to be considered in dimensional-variance cases focuses on whether strict enforcement of a dimensional restriction, taking into account the property's exceptional conditions (including its exceptional "narrowness, shallowness or shape"), would result in undue hardship based on limitations on the development of the property attributable to such conditions. See *North Bergen Action Group v. North Bergen Township Planning Board*, 122 *N.J.* 567, 577 n. 3, 585 *A.*2d 939 (1991). I join in the majority's conclusion that "the physical characteristics of [this] lot" presented a sufficient basis on which the planning board could make a finding of hardship necessary to support a c(1) variance.